IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ARRON MICHAEL LEWIS,
ADC #151373                                                                                    PLAINTIFF

V.                        CASE NO. 4:15-CV-630-SWW-BD

JOHN F. JOHNSON, et al.                                                                   DEFENDANTS

# RECOMMENDED DISPOSITION

## I.  Procedure for Filing Objections

This Recommended Disposition ("Recommendation") has been sent to Judge Susan Webber Wright. You may file written objections to this Recommendation. If you file objections, they must be specific and must include the factual or legal basis for your objection. Your objections must be received in the office of the United States District Court Clerk within fourteen (14) days of this Recommendation.

If no objections are filed, Judge Wright can adopt this Recommendation without independently reviewing the record. By not objecting, you may also waive any right to appeal questions of fact.

## II.  Background

In this case, Arron Lewis, an Arkansas Department of Correction ("ADC") inmate, claims that Defendants Garcia, Stone, Murphy, and Austin used excessive force against him and that Defendant Johnson acted with deliberate indifference to his serious medical needs. (Docket entry #5) The Court previously dismissed Mr. Lewis's claims against

Defendants Bennett, Grayson, Allen, Swagerty, McDonald, Talley, Deleon, and Freeman. (#46) Although Defendant Johnson previously moved to dismiss Mr. Lewis's claims against him, based on the record before the Court at that time, the Court denied Defendant Johnson's motion. (#23, #56)

Defendants Johnson, Stone, Austin, Garcia, and Murphy have now moved for summary judgment. (#80, #86) Mr. Lewis has responded to the motions and Defendants have replied. (#91, #92, #94, #95, #96, #97, #99)

Based on the evidence presented, the Court recommends that the Defendants' motions for summary judgment (#80, #86) be GRANTED.

### III. Discussion

#### A. Standard

Summary judgment is appropriate only when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no real dispute about the facts that are important to the outcome of the case. FED.R.CIV.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246, 106 S.Ct. 2505 (1986). As the moving parties, the Defendants bear the burden of proving that the facts relevant to Mr. Lewis's claims are uncontested.

#### B. Mr. Lewis's Version of Events

Mr. Lewis alleges that on May 27, 2015, he was transported from the Tucker Maximum Security Unit of the ADC to the Pulaski County Regional Detention Facility

("Detention Facility") to examine the evidence against him in his state-court criminal case.  Mr. Lewis claims that on that date, Defendants Garcia, Stone, Murphy, and Austin (the "County Defendants") used excessive force against him and injured his right shoulder.  Specifically, he alleges that when he arrived at the Detention Facility, Lieutenant Bennett (no longer a party to this lawsuit) instructed Defendants Austin and Stone to "process Lewis and make sure he gets a good shower." (#5 at p.5)  Because Mr. Lewis had sued Lieutenant Bennett in another civil lawsuit, he was "suspicious" of Lieutenant Bennett's instruction.  At that time, Mr. Lewis told Lieutenant Bennett that he would not take a shower.

After Mr. Lewis was escorted to the shower area, Defendant Austin instructed him to remove his clothing.  Mr. Lewis complied, but again stated that he was not going to take a shower.  According to the allegations in Mr. Lewis's amended complaint, as well as his deposition testimony, after complying with several other orders, Defendant Austin ordered that Mr. Lewis get in the shower.  Mr. Lewis refused.  Defendant Stone then ordered Mr. Lewis to get in the shower.  Again, Mr. Lewis refused to comply.  At that time, Defendant Austin removed his chemical agent and began shaking it.  Mr. Lewis asked Defendant Austin, "so if I don't get in the shower[,] your [sic] gonna [sic] spray me?" (#5 at p.7)  Defendant Austin responded by stating, "if you don[']t follow my order were [sic] gonna [sic] fuck you up." (*Id.*)  According to Mr. Lewis, Defendant Austin then "put the chemical agent can directly in front of [his] face and sprayed [him]." (*Id.*)

3

At that point, Mr. Lewis alleges, he was "tackled from behind and slammed to the floor." (#5 at p.7) Defendant Austin grabbed Mr. Lewis's left arm and Defendant Stone grabbed his right. Mr. Lewis told Defendant Stone that he could not put his right arm behind his back. Mr. Lewis was then "struck twice across [his] back with an object, possibly a flashlight or baton." (#5 at p.7) Defendant Stone forced Mr. Lewis's right arm behind his back, dislocating his right shoulder. Mr. Lewis began screaming. While Mr. Lewis was lying on the ground, Defendant Austin sprayed chemical agent into Mr. Lewis's mouth and slammed his head against the ground while Defendant Austin laughed. As a result, Mr. Lewis explains, he could not breathe. He was then escorted out of the shower area and decontaminated. Sara Speer (not a party to this lawsuit) evaluated Mr. Lewis and determined that his left shoulder had been dislocated and that needed to be transported to the hospital for treatment.

Officer Freeman (no longer a party to this lawsuit) told Mr. Lewis that he would inform the prosecutor, Defendant Johnson. Meanwhile, Mr. Lewis says, he complained to Officer Wheeler (not a party to this lawsuit) of significant pain in his shoulder and chest. Mr. Lewis was escorted to a holding cell where he remained for almost an hour.

When Officer Freeman and Defendant Murphy returned to transfer Mr. Lewis to the law library, Officer Freeman told Mr. Lewis that he had spoken with Defendant Johnson, who allegedly told Officer Freeman that Mr. Lewis had to review the evidence he came to see before he could be transported to the hospital. Even after he was told of

Mr. Lewis's medical condition, Defendant Johnson allegedly stated, "I don't care if he has a dislocated shoulder . . . he's not leaving until I say he can go." (#5 at p.9)

Mr. Lewis alleges that Defendant Johnson did not allow him to leave for almost three hours and that, during that time, his arm became numb and discolored, and he continued to suffer significant pain. Mr. Lewis states that he was eventually transported to the Emergency Room at the University of Arkansas for Medical Sciences where he was diagnosed with a dislocated shoulder.

    C.    Defendant Johnson

A state official can be held liable for an eighth amendment violation if he "knows of and disregards a serious medical need or a substantial risk to an inmate's health or safety." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009). To state a claim for deliberate indifference, Mr. Lewis must allege "that he suffered from an objectively serious medical need" and "that [Defendant Johnson] actually knew of but deliberately disregarded his serious medical need." *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014). A medical condition is "objectively serious" if the prisoner was diagnosed by a doctor or the need for care is so obvious that a lay person would recognize the medical need. *Id*.

Here, there is no dispute that, at some point, Mr. Lewis suffered from a serious medical need that required emergency treatment. Medical personnel at the Detention Center examined Mr. Lewis's shoulder and determined as much. Although it is unclear

exactly when it became apparent that Mr. Lewis had a serious medical need, the Court will assume, for purposes of this motion, that Mr. Lewis was suffering from a serious medical need at the time he alleges. The question then is whether Defendant Johnson had a sufficiently culpable state of mind.

The subjective element of deliberate indifference is a high standard that requires a mental state of "more . . . than gross negligence." *Fourte v. Faulkner Cty.*, Ark., 746 F.3d 384, 387 (8th Cir. 2014) (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)). In fact, it "requires a mental state 'akin to criminal recklessness.'" *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (quoting *Scott*, 742 F.3d at 340). A plaintiff must show that the defendant's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany v. Carnahan*, 132 F.3d 1234, 1240–41 (8th Cir. 1997).

Here, Defendant Johnson attaches the affidavit of Lieutenant Freeman to his motion. (#81-3) Lieutenant Freeman testifies that, following the underlying incident involving Defendants Austin and Stone, Mr. Lewis complained of shoulder pain and asked to have it examined. (#81-3 at p.1) Contrary to Mr. Lewis's allegations, Lieutenant Freeman testifies that he did not speak with Defendant Johnson about Mr. Lewis's shoulder; nor did Mr. Lewis ever ask him to speak with Defendant Johnson about his shoulder. (*Id*. at p.2) After Lieutenant Freeman took Mr. Lewis to the medical department for an examination, he escorted him to the law library to examine the

6

evidence in his state-court criminal case. (*Id*.) When Mr. Lewis told Lieutenant Freeman that he had finished examining the evidence in the law library, he escorted Mr. Lewis to the medical department and then to UAMS. (*Id*. at p.3) Lieutenant Freeman testified that "at no time while Lewis was in the law library did he complain of shoulder pain." (*Id*. at p.2) He also testified that, if Mr. Lewis had indicated that he was in need of medical treatment, he would have asked either another lieutenant or a captain, but he "would never have asked John Johnson for permission." (*Id*.)

Defendant Johnson also attaches his affidavit to his motion. (#81-7) According to Defendant Johnson, "[a]t no time did Sergeant Freeman notify [him] that Lewis was requesting to reschedule the evidence examination because Lewis wanted to seek medical attention for his dislocated shoulder," and "[a]t no time was [he] informed that Lewis had a dislocated shoulder." (#81-7 at p.3) Further, Defendant Johnson explains, "had [he] been informed that Lewis needed medical attention, [he] would have agreed to reschedule the evidence examination."[1] (*Id*.)

Defendants also provide the Court video footage, with audio, of Mr. Lewis's evidence examination in the law library. (#81-2) In the hours of video coverage, Mr. Lewis uses his right hand to open multiple sealed boxes and many taped envelopes, and to

---

[1] Mr. Johnson testified that while Mr. Lewis was in the bathroom during the evidence examination, he informed officers that "the criminal court judge was sending his law clerk to the jail to deliver the Rules of Criminal Procedure to Lewis and that they should not let Lewis leave until the law clerk brought the book." (#81-7 at p.2) This statement is supported by the video footage provided by Defendant Johnson. (#81-2)

7

handle multiple pieces of evidence. This includes holding and examining an iPad. Further, during the evidence examination, Mr. Lewis can be heard making many complaints to the officers present that he should be provided a writing utensil to make notes; that he was being denied access to his iPhone, iPad, and other video recordings; and that he believed certain pieces of evidence were missing. At one point during the first two hours of the evidence examination, Mr. Lewis can be heard to say that his hand was changing color, but he never complains about shoulder pain; nor does he request any medical treatment.

 Finally, two hours and ten minutes into the evidence examination, Mr. Lewis states that his shoulder is still hurting. He continues to use his right hand, however, to examine evidence. After approximately, twenty more minutes, Mr. Lewis again mentions that his arm is turning colors. He then states that he has completed his evidence review. At that point, the video shows Officer Freeman placing Mr. Lewis in handcuffs without any complaint and escorting him out of the law library.

  According to Mr. Lewis's deposition testimony, he admits that he did not speak to Defendant Johnson during the evidence examination and that they were never in the same

room together.[2] (#81-1 at pp.10, 11) Importantly, Mr. Lewis also testifies that he could have ended his review of the state's evidence at any time. (#88-2 at pp.48-49)

In addition to the video and depositions to support his motion, Defendant Johnson also offers excerpts from Mr. Lewis's medical records. (#81-6) According to those records, in December 2015, Mr. Lewis was evaluated at the Jefferson Regional Medical Center due to complaints of a dislocated shoulder. (*Id*.) At that time, Dr. Pollard (not a party to this lawsuit) noted that when Mr. Lewis was relaxed, "the right shoulder clinically is reduced. Once I focused attention on this and he wants to demonstrate that it is dislocated he obviously contracts his pectoralis muscle which gives a clinical appearance of subluxation/dislocation of the right shoulder glenohumeral joint." (*Id*. at p.2) Dr. Pollard concluded that "this is a voluntary anterior subluxation/dislocation of the right shoulder for secondary gain" and that Mr. Lewis is not a candidate for surgical treatment. (*Id*. at p.3)

Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to "accept unreasonable inferences or sheer speculation as fact." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004). Here, given the circumstances presented in

---

[2] In his deposition testimony, Mr. Lewis also testifies that he did not hear Defendant Johnson speak to anyone on the date in question. (#81-1 at p.11) Mr. Lewis disputed that he made such a statement in his motion to suppress his deposition testimony. (#103 at p.3)

this case, no reasonable jury could credit Mr. Lewis's version of events. Mr. Lewis has failed to present any evidence showing that Defendant Johnson was either aware of his need for medical treatment or that he acted with deliberate indifference to that need. Rather, the evidence presented reveals that Mr. Lewis did not complain of shoulder pain for the first two hours of the evidence examination; that he never told Defendant Johnson of his need for medical treatment; that he continued using his right arm during the entirety of the evidence examination; that he could have terminated the evidence examination at any time; and that he has been diagnosed with voluntarily dislocating his right shoulder for secondary gain. Because the evidence Mr. Lewis offers amounts to "[m]ere allegations, unsupported by specific facts or evidence beyond [Lewis]'s own conclusions, [he cannot] withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). Defendant Johnson is, therefore, entitled to judgment as a matter of law on Mr. Lewis's deliberate-indifference claim against him.[3]

D. The County Defendants

To prevail on an eighth amendment excessive force claim, a convicted prisoner must demonstrate that the defendant used force "maliciously and sadistically to cause harm," rather than in "a good-faith effort to maintain or restore discipline." *Hudson v.*

---

[3] In his motion, Defendant Johnson also argues that he is entitled to absolute immunity on Mr. Lewis's claim against him and that he is entitled to qualified immunity. Because Mr. Lewis's constitutional claim against Defendant Johnson fails as a matter of law, the Court will not address these arguments in this Recommendation.

*McMillian*, 503 U.S. 1, 6–7 (1992); *Santiago v. Blair*, 707 F.3d 984, 990 (8th Cir. 2013). Relevant factors include the need for force, the relationship between the need and the amount of force used, and the extent of injury inflicted. *Whitley v. Albers*, 475 U.S. 312, 321 (1986).

As a matter of law, the "limited application of [chemical spray] to control a recalcitrant inmate constitutes a tempered response by prison officials when compared to other forms of force." *Burns v. Eaton*, 752 F.3d 1136, 1139–40 (8th Cir. 2014) (citing *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000)). The few cases where courts in this circuit have denied summary judgment to prison officials on inmates' excessive-force claims based on the use of chemical spray involve situations "where there was no warning this force would be used, no apparent purpose other than inflicting pain, use of unnecessary 'super-soaker' quantities of the chemical, refusal to allow the victim to wash off the painful chemical for days, and/or use of additional physical force." *Burns*, 752 F.3d at 140 (citing *Walker v. Bowersox*, 526 F.3d 1186, 1189 (8th Cir. 2008); *Treats v. Morgan*, 308 F.3d 868, 873 (8th Cir. 2002); *Lawrence v. Bowersox*, 297 F.3d 727, 730, 732 (8th Cir. 2002)).

Here, Mr. Lewis testifies that when he was booked into the Detention Facility, other than refusing to get in the shower, he complied with every order given. (#88-2 at p.59) The video of the incident, which does not include audio, shows Mr. Lewis refusing Defendant Austin's direct order to "squat and cough," a routine search conducted by

11

Detention Facility officials on incoming inmates. Although the video lacks audio, it is evident from the video that Defendant Austin's final order to Mr. Lewis was to "squat and cough," and that Mr. Lewis's refusal to comply with that order instigated the force used.

Defendant Austin described the underlying incident in a report written the date this event occurred. (#88-1 at p.3) In his report, Defendant Austin explains that when he instructed Mr. Lewis to "squat and cough," Mr. Lewis replied, "I'm not taking a shower." (*Id.*) Mr. Lewis was then given two more direct orders to "squat and cough." Officers told Mr. Lewis that if he continued to refuse to comply, "he would be OC sprayed." (*Id.*) Mr. Lewis then responded, "so you're gonna [sic] spray me because I don't squat and cough," to which Defendant Austin replied, "yes." (*Id.*) Defendant Austin then gave Mr. Lewis another direct order to "squat and cough," which Mr. Lewis refused. At that time, Defendant Austin applied a burst of OC spray to Mr. Lewis's facial area. Defendants Stone and Austin then took Mr. Lewis to the floor. Although Defendant Stone was able to restrain Mr. Lewis's right arm, according to Defendant Austin, Mr. Lewis began tensing his left arm and refusing to place his left arm behind his back. Defendant Austin, then applied a second burst of OC spray to Mr. Lewis's facial area and called a "code blue" (officer needs assistance). Officers then were able to restrain Mr. Lewis and escort him to the hallway to be "assessed by medical." (*Id.*)

Initially, medical personnel were unable to get Mr. Lewis's vital signs because he refused to calm down. After Mr. Lewis calmed down, however, he was decontaminated and taken back to the shower area. (*Id.*)

Defendants also attach to their motion Defendant Stone's report taken the date of the incident. Defendant Stone's report is very similar to Defendant Austin's. Defendant Stone also explains that Mr. Lewis refused to comply with Defendant Austin's direct order to "squat and cough." (*Id.* at p.4) After Mr. Lewis asked Defendant Austin if he was going to spray him if he did not comply with Defendant Austin's direct order, Defendant Stone states that Defendant Austin replied "yes" and gave him a final order to "squat and cough." When Mr. Lewis did not comply, Defendant Austin administered a burst of OC spray to his facial area.

According to Defendant Stone, after Mr. Lewis was taken to the ground, he refused to place his right arm behind his back. As a result, Defendant Stone placed Mr. Lewis's right arm behind his back. After Defendant Austin secured his left arm, Mr. Lewis was handcuffed and lifted to a standing position.

Defendant Stone further states that, after Mr. Lewis was decontaminated, Defendant Stone and Defendant Austin took Mr. Lewis back to the shower area and removed his clothes and handcuffs. Mr. Lewis again refused to shower. According to Defendant Stone, "Deputy Austin walked him into the shower area. We walked him out of the shower." (*Id.*)

Furthermore, according to Defendant Garcia's report, taken the date of the incident, Mr. Lewis refused Defendant Austin's direct order to "squat and cough." (#88-1 at p.15)  After Mr. Lewis refused two more direct orders, Defendant Austin "administered a 1-3 secound [sic] burst of OC spray to the facial area." (*Id.*)

According to the nurse's report taken at 7:28 a.m., immediately following the incident, Mr. Lewis's chief complaint was right shoulder pain. (*Id.* at p.17)  Nurse Speer noted "no deformity." (*Id.*)  At noon, Nurse Speer again evaluated Mr. Lewis and noted a "shoulder deformity." (*Id.* at p.18)  At that time, Mr. Lewis was referred to the emergency room for a possible shoulder dislocation.

The County Defendants also attach to their motion excerpts from Mr. Lewis's medical records.  According to those records, Mr. Lewis "is well known voluntary dislocator." (#88-3 at p.6)

Based on the evidence presented, Mr. Lewis's claims fail as a matter of law.  The evidence reveals that Mr. Lewis repeatedly refused to obey Defendant Austin's direct orders to "squat and cough" for the routine security search.  After being cautioned that OC spray would be administered if he continued to refuse to comply, Defendant Austin administered a burst of OC spray to Mr. Lewis's facial area.  Once taken to the ground, Mr. Lewis refused to allow officers to restrain him, resulting in a second burst of OC spray.  When Mr. Lewis was examined by medical personnel, no significant injuries, including shoulder deformities, were noted.  As a result, the Court cannot conclude that

the County Defendants applied force "maliciously or sadistically to cause harm." Rather, the force applied appears reasonably related to the need to control a "recalcitrant" inmate.[4] Importantly, in his own deposition testimony, Mr. Lewis admits that the refusal to comply with a search for contraband is a security issue which necessitates inmate compliance. (#88-2 at p.58)

Finally, while the Defendants' description of the events that occurred while Mr. Lewis was on the ground differs from Mr. Lewis's, these disputed facts do not preclude granting judgment as a matter of law in the County Defendants' favor.

According to the County Defendants, while on the ground, Mr. Lewis resisted the officers' attempts to handcuff him by locking either his left or his right arm. As a result, Defendant Austin explains that he administered another one-to-two second burst of OC spray.[5] Mr. Lewis then complied with the officers' orders.

---

[4] Even assuming that Mr. Lewis refused the Defendants' orders to shower, rather than orders to "squat and cough," the County Defendants are entitled to judgment as matter of law. It is undisputed that Mr. Lewis refused to comply with the County Defendants' orders. Defendant Austin warned Mr. Lewis that he would spray him with a chemical agent if he continued to refuse. After Defendant Austin's warning, Defendant Stone gave Mr. Lewis another direct order. Mr. Lewis continued to refuse and Defendant Austin administered a one-second burst of OC spray to Mr. Lewis's facial area. Again, based on these facts, no reasonable jury would find that Defendants acted with malicious intent so as to allow Mr. Lewis to proceed on this claim.

[5] Although Defendant Stone does not mention a second burst of OC spray in his incident report, the Court will assume that Defendant Austin sprayed Mr. Lewis with a chemical agent a second time.

15

There is no support for Mr. Lewis's allegation that he was struck across the back of the head with an unknown object, nor do Mr. Lewis's medical records reveal any injury from such conduct. Rather, Mr. Lewis's medical assessment immediately following the incident indicates that, although Mr. Lewis complained of shoulder pain, no deformity or other injury was noted.[6]

Based on these facts, the Court again concludes that no reasonable juror could credit Mr. Lewis's version of events. The Eighth Amendment does not prohibit officers from using force in order to regain control of a non-compliant inmate. Here, it is undisputed that Mr. Lewis refused multiple direct orders; he was cautioned that a chemical agent would be used if he continued to refuse to comply; he continued to refuse, and officers administered OC spray. Once on the ground another burst of OC spray was administered in order to restrain him. These facts do not support a showing of malicious or sadistic intent, nor has Mr. Lewis presented evidence to support such a showing. Because "guards are liable only if they are completely unjustified in using force," the

---

[6] When Nurse Speer evaluated Mr. Lewis at noon on the date in question, she noted bruising on his left arm and a laceration above his left eye. (#88-1 at p.18) In addition, according to excerpts from Mr. Lewis's medical records, on May 28, 2015, at 1:13 a.m., ADC medical personnel evaluated Mr. Lewis and noted bruising on the back of his left arm and several non-bleeding abrasions on his forehead. (#81-4 at p.1) These injuries do not preclude granting judgment as a matter of law in favor of the County Defendants. Rather, such injuries are consistent with the events and use of force described by Defendants Austin and Stone.

16

County Defendants also are entitled to judgment as a matter of law on Mr. Lewis's claims against them.[7]  *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008).

## IV. Conclusion

The Court recommends that the Defendants' motions for summary judgment (#80, #86) be GRANTED.  Mr. Lewis's claims should be DISMISSED, with prejudice.

DATED this 16th day of March, 2017.

                                                                     _____
                                                                      UNITED STATES MAGISTRATE JUDGE

---

[7] In their motion, the County Defendants also argue that they are entitled to judgment as a matter of law on Mr. Lewis's official-capacity claims.  Mr. Lewis, however, previously moved to voluntarily dismiss his claims against the Defendants in their official capacities, which the Court granted.  (#35, #41)